Good morning, Your Honors. May it please the Court, my name is Tom Woodbury. I'm here representing the appellants today. One thing the parties do agree on in this case, Your Honor, is that this case is all about watershed recovery. After decades of clearly excessive timber harvests in the headwaters of the North Fork of the Coeur d'Alene River were largely halted more than a decade ago, this damaged watershed is currently exhibiting positive ecological trends. It is stabilizing and it is recovering naturally due to one simple thing, tree growth and the increasing canopy closure resulting therefrom. Now, in the name of watershed recovery, the Forest Service proposes to reduce canopy closure another 70%, which will reverse these positive trends, destabilize the streams once again, and retard the natural recovery process, according to the Forest Service's own statements. Was one of the alternatives take no action? I'm sorry, Your Honor? One of the proposed alternatives was take no action? There was a no-action alternative and there was an alternative that involved no timber harvest but road restoration or maintenance. Did your group advocate either one of those in front of the EPA or the Forest Service? Yes, Your Honor. The parties supported alternative six. Which was? Which was basically road maintenance and no timber harvest. And it was also the alternative that the Department of Environmental Quality initially said was the only alternative that actually would result in any restoration in the watershed. Who originally said that? The Department of Environmental Quality, Idaho Department of Environmental Quality. What's the number of that alternative, sir? Alternative number six. If allowed to proceed, the annual sediment delivery to the streams in the project area will increase for the next five to nine years in the Iron Creek watershed, in the cumulative effects analysis area, and in the extended cumulative effects analysis area. And the equivalent clear-cut area in the upper little north fork of the watershed will increase from 18% to approximately 23%, resulting in further observable adverse changes in the affected streams, according to the Forest Service's legal arguments to the score. However, nowhere in the administrative record are we informed what those observable adverse changes will look like, nor are we told what the impacts will be on the affected fisheries. And yet these are the issues of critical concern to a watershed that is no longer supporting the fisheries and needs to be recovered. No single issue before this court better illustrates the failure of the Forest Service to take a hard look at the cumulative impacts of timber harvest in this watershed on the fisheries than the refusal of the Forest Service to even consider their own forest plan standard for fisheries. The upper north fork of the Coeur d'Alene River above Iron Creek, which is most of the project area, is designated as a high-value stream in the forest plan. According to the forest plan, this means it is critical to the maintenance of river and lake populations of species of concern. And it will be managed at a standard higher than the 80% FRI emergent standard established for all other streams. And perhaps most significantly for these high-value streams, according to the forest plan, monitoring will be needed to detect this higher standard. The Panhandle has never even referenced this critical forest plan standard in the EIS in direct violation of the Forest Act. And they use NFISH as a shield against compliance with their own forest plan standard. However, NFISH is unambiguous on its face and there is no room for agency discretion. If you look very carefully at the clear language, such as, quote, these interim standards and guidelines replace existing conflicting direction in forest plans, except where forest plan direction provides more protection for inland native fish habitat. The Forest Service has never attempted anywhere to explain how NFISH buffers, which are prophylactic in nature, conflict with the FRI emergent standard, which is an in-stream standard that measures cumulative impacts of timber harvest. So in your view, both standards apply? In our view, both standards apply, Your Honor. And as well, if you read NFISH, NFISH itself says the combination of buffer zones with the standard and guidelines of existing forest plans, such as the FRI emergent standard in the Panhandle National Forest, would provide a benchmark for management actions that reflect increased sensitivities and commitments to ecosystem management. So NFISH itself presumed that the existing forest plan standards would remain in effect, unless somehow they were actually contradictory to what NFISH required, which is not the case here. And you're saying that nowhere in all of this record was the FRI emergent standard utilized? It was not, Your Honor. If it had been, we would have much more information about what it actually will take to recover this watershed and the fisheries in this watershed. For example, we would now know, if they applied the FRI emergent standard, what the spawning site composition is in all the streams of concern in relation to what spawning site composition would be in a functioning stream. We would know now what the equivalent clear-cut acreage of anticipated harvest levels in the next decade are, which are established in the geographic assessment and which the Forest Service refuses to consider in their cumulative impacts analysis. We would know what the projected water yields post-project and in the next decade, in considering the projected harvest in the geographic assessment are. In relation to- Your argument right here now depends on this projection ahead. I'm sorry, Your Honor? How much of your point depends on our accepting the view that you have to take into consideration projects in the next 10 years? Not. It's not critical to our arguments, Your Honor. It's just an example- Omission. I'm sorry? You still have the omission to treat FRI emergence even if you- Right. This is- Don't project forward. Yes. These are just examples of if they had gone out and measured or determined that the FRI emergent standard was not being met. These are the additional informational requirements that would be necessary, which are all designed to determine what it's going to take to recover the watershed. That's the whole point of all of this additional data gathering under the FRI emergence standard. And the FRI emergence standard also would require them to establish and disclose the thresholds of concern for water yield analysis in the affected streams, something that they have never done here in spite of the fact that they call this watershed recovery and in spite of the fact that those thresholds have already been exceeded. Could you elaborate for me on the issue of- and how it's treated in the impact statement of toxic sediment being stirred up by increased- I guess increased flow in the river- Sure. If you do this log. Essentially, what the Forest Service did was to analyze water yield increases in terms of average monthly peak flows over an extended period of time. What Forest Service's own experts say is that the actual damage comes from instantaneous peak flows. In other words, what is the worst event that would happen in a 30-day period? So the damage comes from the high water, not from the average. Yes, the average is basically taking the high flows on every day for 30 days and then averaging those out. So that moderates, in other words, what the worst day in that 30-day period would be. And that would be the type of- those high peak flows are the ones that actually scour the river flow downstream because of the accumulated canopy removal, stir up the toxic sediments from the bottom and actually carry them across Lake Coeur d'Alene into the Spokane River. Why are there toxic sediments there? Is that because of the South Fork? It was a mining- Yes, Your Honor. From a long period of mining, the South Fork of the Coeur d'Alene River is essentially a Superfund site with elevated levels of toxic sediments. They haven't determined yet what it's going to take to remove those and make the- Okay, so if the North Fork has got more water in it at a high water mark and it flows down to where it joins with the South Fork, I guess? Yes. How does it stir up anything in the South Fork? The North Fork and the South Fork converge. Right. And then the elevated flows pick up sediment south from the convergence Oh, I see. and carry that across Coeur d'Alene into the Spokane River. Okay. And then what we know- and again, what the Forest Service does to avoid the sort of cumulative effects analysis and give us a realistic idea of what's happening there is that they just talk about what's the incremental- the effects of incremental flows above the currently aggravated conditions and they say, well, the incremental is not even measurable. However, again, they're talking about average monthly flows and not the peak flows. Yet what we know is that these events, these rain on snow events that create the worst flooding spikes in the river have increased dramatically since more intensive timber harvest was commenced in the North Fork of the Coeur d'Alene River in the 1950s. According to the USGS measurements, these rain on snow events occurred- and we have all the years in which the worst flooding occurred from rain on snow- in 1917, 1933, 1946, and 1951. So up into the 50s, about once a decade. After that, 1961, 1964, 1974, 1980, 1982. Five in 20 years, or about one every four years. And then, logging continuing in the 60s and 70s. Then 1990, 95, 96, 97. Four in seven years. Every other year, basically. So they're getting progressively worse. And this is because of the exact thing of incremental additions and the cumulative impacts of continuing to remove the canopy from the headwaters. Obviously, trees use water. The more trees you remove, the more water is released into the headwaters and the more spikes and the worse conditions you have downstream. And the thing is that those keep getting higher, basically higher and higher. What happens is that the more those flows increase over time, the larger events then scour more sediment that would otherwise not be unrolled. What's the Forest Service's rationale for doing the logging as part of the rehabilitation of the forest? Well, the Forest Service says that there are basically about 200 culverts that are poised to fail. And that in order to remove and upgrade those culverts, that they need to basically roll another 3,600 approximately logging trucks through there to pay for culvert removal or culvert upgrades. And this, Your Honor, is so basically they're talking about a theoretical future avoidance of culverts, stream crossings, sediment being washed into the rivers. Unfortunately, that's just based on fabrication and theory. The plaintiffs, once the record of decision was issued and the snows subsided, plaintiffs sent out a civil engineer with extensive, you know, 33 years of experience in overseeing construction or installation of culverts. And he actually inspected the culverts in the project area. He found four culverts that were operating at risk. And he estimated that all the other culverts were properly functioning and had an operation life of at least another 30 years. Was this part of the expert testimony you tried to supplement the record with? We attempted to submit that in the lower court. We had no opportunity to submit that to the Forest Service because the FEIS came out in November of 2001. The record of decision came out in February of 2002. Obviously, we couldn't send an expert out in the middle of the winter to inspect culverts that are buried under two, three feet of snow. As soon as there was an opportunity to send him out there, we sent him out there in August, basically, of the next year. And he inspected them and found that they were just operating functionally and that this supposed justification for the project is a fallacy. And what you can. And I'm not sure which issue this relates to is that the Forest Service did not send someone out there to inspect. They we had Mr. Ball had actually fought, you know, under the Freedom of Information Act, asked for information that hard data basically supporting these discriminations that these culverts were failing and so forth. And they said there was no such information. They basically had maps. It was all apparently it was just based on what they had in their maps and so forth. If we were to find either a violation of NEPA or the National Forest Management Act in this case, what is the remedy? The remedy that you're seeking an injunction against the basically what the Administrative Procedures Act says is that if you find that the decision was not consistent with the law, then they have to set aside. You have to set aside the decision. So that's what I'm confused about. You remanded back to the agency. Do you enjoy the alternative from proceeding? Do you grant, I guess, reverse and grant summary judgment? And are the remedies different for the NEPA violation? No. The violation of the NFMA. No, they're not. No, basically, under the Administrative Procedure Act, whether it's a violation of NEPA or NFMA, you simply set the decision aside and then join them from going forward with the project. And they're free to go back and do further analysis, restudy the project, do an actual watershed recovery project if they can. But they would have to go back and either supplement the documents underneath. But it just depends. Under the Forest Act, for instance, if you were to find that they're not ensuring the viability of bull trout and West Slope cutthroat trout and pine marten and so forth in the forest, then they have to do viability assessment studies before they can go forward. And especially with regard to the pine marten, there's no question in this case that they're not ensuring the viability. There's nothing in the record that says that the pine marten is doing fine in the forest. They're eliminating 57 percent of its habitat in the project area, four out of seven territories. The pine marten depends on exactly the kind of forest that they want to basically cut over 80 years old in the project area. And they don't even reference how the pine marten is doing in the rest of the forest. That's another question that was raised by your briefs talking about various wildlife and what could be the impact of going forward with alternative aid on these various wildlife. Doesn't the Fish and Wildlife Service have to become involved in this? Only where there's endangered or threatened species under the ESA. I know the northern bassock is endangered or threatened. The Forest Service, the requirement under the Forest Act to ensure viability species is designed to prevent those species from being listed under the ESA. You know, it's a prophylactic sort of measure. And they're required to basically have adequate habitat in the forest or monitor populations. The law actually says they have to monitor populations and let us know how the project would affect the trends. They don't have any population data. This court in the past has allowed them to substitute habitat data. The only habitat data, they try to say they represented to this court that the TSMRS database for showing old growth forest wide was upheld in Lands Council versus Vought. Lands Council versus Vought specifically held at page 1224 and 1225. The TSMRS database overestimated. There was no hard data in it except for the project area in question in that case. But forest wide, there was no hard data. And it overestimated old growth by a third to half. And even more significantly, the TSMRS database, according to the record and Forest Service in this case, says nothing about downed woody debris and snags, which the Forest Service says are the most important components of habitat for the pine marten. So for the pine marten, we have no population trend data. We have no habitat data. They want to destroy most of the habitat in the project area, and they try to say that they're ensuring viability. There's absolutely nothing in the record to support that finding, and therefore they're in violation of the Forest Act on old growth species as well. If I could have a couple of minutes for rebuttal, I would appreciate it. If I may. Thank you, counsel. Good morning. I guess it's good afternoon. I'm Kelly Johnson. I'm representing the Forest Service. With me at counsel table is Deborah Ferguson. As evident this morning and then also in the briefs that have been filed in this case, Mr. Woodbury raises a number of concerns about the Forest Service's analysis of this project. And let me stress, this was a six-year decision-making process. It started in 1996, and the final record of decision happened in February of 2002. As the extensive record generated during that six-year period makes clear, the Forest Service did exactly what the law tells it to do. It complied with the National Environmental Policy Act, or NEPA, and it complied with the National Forest Management Act, or NFMA. The Forest Service comprehensively examined on the ground, and it's clear throughout the record, the current conditions of the project area. It then proceeded to examine the cumulative effects of the project on the project area. I'll start with the aquatics, because Mr. Woodbury is correct. There is no dispute. This is an aquatic restoration project. It is also a vegetation restoration project. I get vegetation restoration project also is one of the goals. I'm sorry. So with respect to the aquatic restoration component of this, the Forest Service, as it has the right to do, used a model, the so-called Watson model. That model has a series of inputs to it that measure peak flow increases as a result of a variety of activities. Those reflect increases in sediment generation from various precipitation events, including rain on snow events and other activities that Mr. Woodbury has referenced. Under that, using that model, it is clear that both in the sub-watershed level, in the project area, and in the extended cumulative effects area, this project is not going to have a measurable increase on peak flows or on sediment yields. With respect to your question, Mr. Gould, Judge Gould's question about the toxic sediments, that is something that was raised by the appellants. It is extensively analyzed on pages 385 to pages 392 of the supplemental excerpts of record. And based on that analysis, the Forest Service concluded that there was no risk or less than one-half of 1 percent chance that increased peak flows under the worst-case scenarios would have any impact downstream. Certainly, they would not dislodge any of the toxic mining waste that Mr. Woodbury has referenced. There was also a question with respect to timber harvest in this area. This is a 21,000-acre project. Approximately 1,400 acres are going to be logged. They will not be clear-cut. Approximately 70 percent of the trees will be harvested. That harvest will accomplish two purposes. First, as Mr. Woodbury acknowledged, it will generate some funds for the Forest Service to take other restoration work. It will also help the Forest Service attain one of the goals for this project, which is vegetation restoration. This is an area that has been heavily disturbed for a variety of reasons, including historic mining activity and natural causes, for example, white pine blister rust. This harvest, and after the harvest is done again on these 1,400 acres, there will be a burn to decrease the risk of future fire, and then the Forest Service will go in there and replant species that will trend the area to its historic and much more resilient composition. They'll replant with pine blister-resistant white pine and western larch. And that's, I think everybody would agree, a good thing, and that's to get back to the historic composition. There will be no old growth harvest. And, in fact, Alternative 8 was modified between the FEIS and the Record of Decision to take out areas that could be potentially old growth or exhibited old, potentially could have old growth characteristics in the future. They were taken out. Pine marten, which Mr. Woodbury spoke about, is a management indicator species for old growth. Because there will be no old growth harvest, the viability of the pine marten will not be impacted. The Idaho Panhandle National Forest and the Coeur d'Alene Ranger District, where this project is located, will continue to meet the old growth standards set forth in the plan. And that's an IFMA obligation, and the Forest Service reasonably concluded that it would not have an impact on the viability of those three management indicator species. With respect to Mr. Woodbury's claim about the declaration that was excluded by the district court, I'd like to say, again, this was a six-year decision-making process. Mr. Woodbury's clients and another number of interested parties were active participants in the decision-making process. It's a record review case. That would have been something that they should have submitted to the agency as it was going through this process. I'll go back to the issue he first started with, with respect to the fishery standard and what he perceives to not be a conflict between the Inland Native Fish Strategy or InFISH and the FRI emergent standard. InFISH replaced the plan standard for fisheries, except to the extent that the plan standard was more protective for fisheries. That is not the case here. The FRI emergent standard allows degradation of habitat. InFISH does not allow any degradation of habitat. And, in fact, establishes riparian habitat conservation areas and riparian management objectives that the Forest Service will follow as it goes through this. His fisheries claim is not a NEPA claim. We're not talking about how much information is out there. And if we are, we can. We can talk about entire parts of the record that have to do with aquatic resources. It's an NIFA claim. And the Forest Service rightfully concluded that the appropriate standard was InFISH because it better protected the degradation of habitat. The only other issue I guess Mr. Woodbury started with was the issue of canopy closure and equivalent clear-cut acreage. Again, the Forest Service considered cumulative impacts on watersheds at three geographic scales, the sub-watershed, the project area, and the extended cumulative effects area. With respect to the 18% equivalent clear-cut acreage that Mr. Woodbury references, in that watershed, under the models the Forest Service used, they concluded that there would be an approximately 8% increase in peak flows. This is a slight increase but not sufficient enough to actually cause a measurable impact. With respect to the entire project area, with this timber harvest on these 1,400 acres, the Forest Service concluded that there would be an approximately 3% increase in peak flows. And just, it is in the record, but the equivalent clear-cut acreage for the entire project is 13.1%. So just to put it all in perspective, Mr. Woodbury was referring to a sub-watershed when he refers to that 18%. And the Forest Service did analyze that. I have to, this probably will reveal my lack of understanding of this whole subject, but how does the forest, how is the timber harvest, the logging of the forest, actually helpful to the watershed recovery? Well, the forest, the primary way it is helpful for watershed recovery is the fact that it will generate revenues to help remove roads, 76 miles of roads, 176 culverts. But it will also be helpful, and this again is one of the goals that the Forest Service has made clear throughout the project, is that it will help restore this area to its historic and much more resilient composition of trees. See, that's the point I don't understand, how logging the trees is going to restore the trees. The trees that are currently now there, the Delphosphora, for example. It's going to replace them with other trees. We want to, the Forest Service is going to replant trees that were historically in this basin, the White Pine and the Western Larch. And these are species that have been shown to be much more resilient to a variety of factors, except for, unfortunately, back when this area was logged, they weren't resilient to the White Pine blister rust, which is a fungal disease. That's not really a concern anymore. We now have varieties that are resistant to that. And those will be planted in those 1,400 acres. There's some discussion in the appellant's brief about the failure to take stimulative effect into account, and they deal with both past logging and future. You may have partly already addressed this, but I wondered if you could. Well, with respect to, I think, the past timber harvest, the Forest Service went out there. It obviously reflects the current conditions on the ground. And so past timber harvest was something that was, the ground reflects what happened then. And there is some, the appellants do have some talk about timber harvest, or not including lists of timber harvest. This was an issue not raised prior to the appellate courts. It isn't really relevant, because I think the issue is what was the effect of that harvest. And that is something that the Forest Service has clearly documented throughout the FEIS and throughout the administrative record for that. With respect to reasonably foreseeable actions, they talk both about another project, the Deerfoot Ridge Restoration Project. As a practical matter, that was not a proposal during the time period that this decision-making process was ongoing. But even if it was, it is in a totally separate watershed that flows into a surface lake that has no connection whatsoever to the Coeur d'Alene River. With respect to the geographic assessment, that's an analysis of existing conditions and identifies opportunities for future projects. It is not a proposal to act. It was proper for the Forest Service not to view it as such. Did the draft EIS include the proposal for timber harvesting? The draft EIS had a variety of proposals in it, including various timber harvests, correct. And then in the final EIS, the preferred alternative I think had approximately 1,800 acres worth of harvest. The Forest Service, when the record of decision was issued, scaled that down to 1,400 acres, primarily because during that time when they were out there doing on-the-ground surveys, they realized some of that acreage was actually mature trees that should not be harvested until they were able to go out there and more closely examine them. So it was modified and shrunk down in the final record of decision. I think I've gone over all of the issues that you have asked about, and then Mr. Woodbury had mentioned one thing in terms of the management indicator species. Again, the pine martin, the woodpecker, and the northern goshawk, they're management indicator species for old growth, and the Forest Service can use old growth as a proxy for viability. And again, there's no old growth harvest in this project, and, in fact, in the long term, this is going to begin to trend the project area towards having increased mature forest and interconnectivity. If there's no other questions, I guess I just want to say that I think the extensive record in this case shows, and as the district court found, the Forest Service was not arbitrary and capricious. It complied with NEPA's obligations to examine and take a hard look at the environmental consequences of those actions that included past timber harvest and included the cumulative effects on this project on a variety of resources, and it included reasonably foreseeable actions within this watershed. The Forest Service was also not arbitrary and capricious in determining and concluding that the project complied with the standards in the Idaho Panhandle National Forest Plan for fisheries, for soils productivity, for old growth, and for wildlife species. When your opponent was asked what's the purpose of the logging, he said basically it was to pay for the culvert replacement. I think clearly the revenues from the logging would be used to accomplish some of this restoration work. Again, as the Forest Service has made clear throughout this, the primary goal of this project was not a timber harvest. It was to restore an ecosystem that everyone will acknowledge has been heavily disturbed from a variety of causes, including past timber harvest practices, fires, and a variety of other things. And, excuse me? Mining. Mining, that would be correct. I mean, this is we're not talking a virgin forest. I mean, we're talking an area that has a lot of disturbances, and there are a number of roads, and there are a number of culverts. And when Mr. Woodbury refers to the theoretical failures of them, we know roads fail, culverts fail. And when those failures occur, sediments get in the stream, and there is no doubt about it. It could happen tomorrow. It could happen in a year. They need, as long as they're there, and they're going to fail. And so this project removes them and removes that risk. If there's no other questions, thank you. Thank you. Your Honor, I'm very happy to hear that NFISH does not allow degradation of habitat. Considering that the project would add an additional 6 percent of sediment per year to streams that are already not meeting water quality standards, then I assume the Forest Service is going to withdraw the project under NFISH. The Forest Service, every argument that they're making to minimize the impacts of this project proves our case, that they are not considering cumulative impacts of the project. Cumulative impacts means what is the impact of the past logging together with this logging and logging that we intend to do in the future? That's cumulative impacts analysis. And saying that, for example, the water yield will only increase 2 percent in peak flows as a result of this, and that's not detectable downstream ignores the fact that the water yields are already elevated, and we're not told what the impacts of canopy removal and timber harvest on those water yields is, what portion of that water yield and the problem downstream is attributable to exactly this kind of a project. The trick of the Forest Service is to take existing conditions and call that cumulative impact analysis, and then analyze everything in terms of percent increases over cumulative impact and over existing conditions. That's not cumulative impacts analysis. That's basically accepting a degraded condition of the forest as your baseline, and then saying, oh, it's only increasing another 6 percent, when in fact it's already too high. It's already too high. Let's talk about cumulative impact analysis, what this would really look like. We know that these streams are not currently functioning as fisheries due to excessive canopy removal and timber harvest, and the sediment loading associated therewith. We know that the consequence of another 70 percent canopy removal will be further increases in actual annual sediment discharges for at least the next 5 to 9 years. How much worse will things get before they get better? We're not told that. We're not told what the impacts in that next 5 to 9 years are going to be on these streams. How much worse can things get, and for how long, how many years, can we tolerate things getting worse without extirpating the West Slope cutthroat trout, which is already at depressed levels, the same way they've already extirpated the bull trout from canopy removal and timber harvest in the project area. That, your honors, would qualify as meaningful cumulative impacts analysis in the context of a watershed recovery project. The public has a right to know the answer to these questions. How can you go into a watershed and say, we're going to recover it without ever telling us what the goals of recovery are? When is it going to be recovered? In another 100 years when the white pine trees turn into old growth? 160 years, I should say? What's wrong with the 100-year-old trees that are there right now? The fisher, the management indicator species for the kind of habitat that they want to log, depends on a mixed conifer and subalpine fir older tree class, 80 years and older. That's what they want to log. If there was white pine there, the white pine would also be the kind of trees that the fisher depends upon. But the fisher is doing fine with those kinds of older trees, the 80 years and older classes of trees that are there right now. And the impact of this project, going and removing all that habitat, is obviously going to adversely impact the fisher. You say they're cutting 80-year-old trees, but they said they're not cutting old growth. What's the difference in definition? Well, they're saying that they're not cutting allocated old growth trees, which is sort of a technical definition of types of stands. With reference to, for instance, the northern goshawk. The northern goshawk requires certain levels of that definition of old growth in its habitat and in its territories, which isn't there right now. But with regards to the fisher, the fisher is an indicator for older classes, basically over 80 years. So, in other words, Your Honor, it's clear that there's not enough old growth habitat in the project area, and the fisher is a good indicator of ecological health and what the impacts of this project are going to be, because this project will basically retard the recovery of old growth habitat in the project area the same way it will retard the recovery of the fisheries from decades of overharvest, because they're moving the age classes from, for instance, currently there's 14 percent younger age classes, younger trees in the project area. When they're done, that's going to be 30 percent, and that increase comes at the expenses of age classes 80 years and older, which means in the last century, those trees that have started to ripen into old growth are 100 years old now. If they leave it alone for another 50 years or so, you're going to have high-quality old growth habitat and canopy closure and everything else that all the old growth species require. But if you say, oh, we've messed up, you know, we need to start over again, let's go and log everything else that's over 80 years old and plant what was there 200 years ago. Well, I suppose that would be fine if the rest of the forest was doing so great that you could afford to do that in this particular watershed and set your goals for 200 years down the road. But the fact of the matter, the rest of the forest is not great. The rest of the forest is in a similar sort of condition as this part, and all they're doing is basically trying to justify continuing to hammer the forest the way that they've always hammered it, to the detriment of the species. And so if that's their rationale, okay, it's possible that that could be a justified rationale. We want to restore this to a 200-year-old white pine blister, and so our watershed recovery project is 200 years down the road. Okay, well, that's going to have a very adverse impact on the pine marten that are in there right now. So please tell us how the pine marten are doing in the rest of the forest. Well, they haven't done that. So how are you ensuring viability of the pine marten by destroying its habitat? They're not. That's illegal. Right. Counsel, you've gone over if you want to step up. The only thing I would like to say in closing is that we haven't been able to get an injunction pending appeal on this project, and road restoration could go forward as soon as June, and road restoration would add a lot of sediment to these streams, so we could start suffering more irreparable harm as early as June, and I think it's just important for the Court to be aware of that in the timing of its decision. All right. Thank you, Your Honor. Thank you very much, Counsel. Thank you for your patience. Counsel versus Powell will be seated. All rise. The court for this session stands adjourned. adjourned.
judges: Canby, Wardlaw, Gould